## KATHERINE HARRISON v. THE STATE.

### No. 4253. Decided December 20, 1916.

**1.—Murder—Evidence—Character of Prosecutrix.**

Upon trial of murder, where the evidence showed that the deceased, about a year before the homicide, had raped the defendant when she was under the age of consent, and that this was the motive of the defendant in killing the deceased, testimony that the defendant was guilty of lewd and lascivious conduct on several occasions subsequently to the alleged rape upon her, and had an abortion produced upon her, and lived in adultery with another, all of which occurred before the killing and long after the alleged rape, was inadmissible; and its admission in evidence was reversible error; the character of the defendant not having been made an issue in the case.

**2.—Same—Evidence—Leading Question.**

Upon trial of murder, it was reversible error to propound leading questions to the sister and mother of the defendant with reference to an abortion performed upon defendant.

**3.—Same—Jury and Jury Law—Practice on Appeal.**

As the objectionable juror will not be a juror in any further trial, the question that he had been convicted in the Federal court for sending obscene matter through the mail need not be considered.

**4.—Same—Jury and Jury Law—Qualification of Jurors.**

Where the question as to the qualification of a juror, with reference to the presumption of innocence and reasonable doubt arising upon his voir dire, had been adversely decided to the appellant, it need not again be considered. Following Coy v. State, 78 Texas Crim. Rep., 184. Davidson, Judge, dissenting.

Appeal from the District Court of Tarrant. Tried below before the Hon. Ben M. Terrell.

Appeal from a conviction of murder; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*McLean, Scott & McLean*, for appellant.—On question of character of defendant when not put in issue: Hartless v. State, 32 Texas, 89; Johnson v. State, 17 Texas Crim. App., 565; Felsenthal v. State, 30 id., 675; Maxwell v. State, 78 S. W. Rep., 516; Thompson v. State, 38 Texas Crim. Rep., 335; Holsey v. State, 24 Texas Crim. App., 35; Brownlee v. State, 13 id., 255; Johnson v. State, 17 id., 565.

On question of other offenses: Denton v. State, 42 Texas Crim. Rep., 427; Gardner v. State, 55 id., 400; Monroe v. State, 56 id., 444; Welhousen v. State, 30 Texas Crim. App., 623; Parker v. State, 75 S. W. Rep., 30.

*C. C. McDonald,* Assistant Attorney General, and *Marshall Spoonts,* County Attorney, for the State.

DAVIDSON, JUDGE.—From a conviction of murder with five years penalty attached appellant brings this appeal.

The facts may be briefly summed up as follows: Deceased, W. L. Warren, had sexual intercourse with appellant about the time and a little before she was fourteen years of age in his room at his hotel or lodging house. She went to the room after her parasol which he had carried to that room. This occurred in the fall of 1914. About the 22nd of December, 1915, at or near Benbrook, seven, eight or ten miles west of Fort Worth, she shot and killed Warren, assigning as a reason his previous rape committed upon her. She made a confession in regulation style. The State introduced a portion of this; the defendant introduced the remainder, so the whole statement finally got before the jury. For brevity the confession will be placed altogether. After setting out the formal parts it reads:

"On the night of the 22nd of December, 1915, Charley Harrison and I were driving; we stopped between Tenth and Eleventh Streets on Main. Charley was across the street getting a shine and I was sitting in the car, when Mr. Warren came along, and I thought that it would be a good time to take him out and kill him, so I asked him to get in and take a ride, and as soon as Charley came back I introduced them and we went out the Arlington Heights road past Benbrook, and after we got to the place where he was found, I pretended that something was the matter with the tire and we all got out of the car; before getting out I got the pistol out of the car; the gun belonged to Charley and I knew that he kept it in the car. I drove the car and Charley sat in the front seat with me and Warren was in the rear seat. After Warren had looked at all the tires he came around in front of the car and I turned on him and began to shoot. I think the first shot struck him in the arm; he then threw up his arm and stumbled over toward the tree and fell in a position somewhat like he was on his knees and I followed him up and continued to shoot until the gun was empty. I think I shot eight times. The gun was a S. & W. automatic 35. Then Charley and myself got into the car and came back to town, with Charley driving, and he drove very fast. We came back the same way until we almost reached town, then we went through North Fort Worth." The above part of the confession was introduced by the State. The remainder of it introduced by defendant reads as follows:

"Some time about the first of November, 1914, I was introduced to Mr. Warren by a friend of mine. A few days after that I saw him

downtown and he walked with me for a time and carried my parasol. When I left that evening I neglected to take my parasol and he carried it home with him, and when I went to his hotel to get the parasol he locked the door, and by force and threats forced me to have sexual intercourse with him. His hotel at that time was the Southern Hotel, at Tenth and Main Streets. I did not speak to him any more, except one time, until the night of the murder.

"I had thought many times that I would be justified in killing this man, and had told Charley about it, but he did not take it seriously, as he thought I would not have the nerve to do that. Charley and I were engaged to be married at this time. I had thought about the wrong this man, W. L. Warren, had done so much that I grew to hate him and wanted to see him die, but I had never formed any plan to kill him until I saw him passing that night and all at once the idea came to me that I could do it that way and make it all right."

This is her entire confession as embodied in the record. The State, to get away from the rape by force confession, introduced testimony to show that appellant had gone quite a number of times to Warren's room after this alleged rape. The purpose of this was evidently to contradict her as to the rape by force, and to show that the rape was with her consent, she being under fifteen years of age. This was a contradiction, and legitimate for that purpose, but it did not change the proposition of rape. It would be rape whether by force or consent inasmuch as the girl was under fifteen years of age. This is one of the means the State had of contradicting the girl and impairing her statement or version of the transaction. There seems to be from the record no reason or motive for the killing, except that assigned by the girl, towit: the way deceased had treated her. The defendant's testimony contradicts the State's theory of intercourse by consent, and sustains her view of the matter that she had not frequented his place or room. It is also shown, with little or no contradiction, that deceased was in the habit of debauching girls along about fourteen or fifteen years of age, and acquired a reputation not only at Mineral Wells, where he formerly lived, but also at Fort Worth, for this character of dealing with young girls. A number of girls visited his room, or were carried there by him and debauched. Charley Harrison two or three days after the killing married appellant. His relations with her began after the first transaction between the girl and deceased.

The State introduced testimony, in substance, that the girl was guilty of lewd and lascivious conduct on several occasions subsequent to the transaction at the hotel with the deceased. The witnesses gave full and lengthy details of those matters. The State also introduced her statements, among others, that she had had intercourse with Charley Harrison, and had gone to Dallas with him and there had an abortion produced on her, and that he had lived with her in adultery in his father's house during his father's absence from the State on a summer tour. These matters occurred before the killing, but long after the

rape by deceased. A number of objections were urged to all this testimony. Upon what theory the State introduced this evidence is not manifest from the record, nor from the statement of facts or the bills of exception. The act of intercourse between herself and deceased, stated in her confession, and relied upon by the State, occurred long prior to those matters. She had not placed her character in issue for chastity or virtue, and the State could not. It was not admissible as touching her character for chastity and virtue, because this had not been made an issue by her. The different bills and the facts set out in them are not repeated, it being deemed unnecessary. Appellant was being tried for homicide; not for lascivious conduct, nor for being a lewd girl, a fallen and degraded woman, or an abortionist, nor for vagrancy. It is not contended that deceased was connected with those different transactions, nor with the girl's act in having an abortion performed, if it was performed. The abortion was not shown except by her statement to one or more of the witnesses. All these matters and kindred questions not specifically mentioned occurred after deceased had debauched and ruined the girl.

There are two bills of exception to questions and answers of the sister and mother of appellant. The sister was asked: "Now you don't know, of course, whether she was crying about her pregnant condition by Charley Harrison or the fact an abortion had been performed at his request or something else do you? A. No, I don't know." Mrs. Tackett, the mother, was asked: "Did you know your daughter went to Dallas during the summer of 1915 with Charley Harrison to have an abortion performed? A. I did not." These questions will not be asked upon another trial. The testimony was illegitimate to begin with, and in the next place if it was legitimate to prove the fact that she went to Dallas to have an abortion performed, or she was crying about her relations with Charley Harrison, the questions were not proper; they were clearly leading, assumed the fact to be that she did those things, and followed by an inquiry as to whether these two witnesses were aware of those occurrences. The questions assumed the truth of the matters. Upon another trial if these phases become material or legitimate, the questions will be properly asked. Whether these witnesses knew or did not know of the abortion is not material; nor was it permissible to prove an abortion if it occurred. It would make no difference, so far as the killing of deceased is concerned, whether she or Charley Harrison, or both, had an abortion committed on her.

Calloway, who had been convicted in the Federal Court for sending obscene matter through the mail, will not be a juror in any further trial. It is useless to discuss that matter.

The writer believes another issue is well taken, but the matter has been decided adversely to his views in the recent case of Coy v. State, 78 Texas Crim. Rep., 184, 180 S. W. Rep., 264. In that case the jurors were asked practically the same question as here, that if they had the belief in their minds that defendant was guilty, yet if they

believed that the State failed to prove his guilt over the presumption of innocence and reasonable doubt, if they would give him the benefit of the reasonable doubt. The writer believes that question is legitimate and was not out of place in testing the qualification of the jurors. There are many cases that arise where a juror would or may believe that an accused party is guilty but the State had failed to make its case by legitimate evidence to the exclusion of the presumption of innocence and reasonable doubt, but the majority decided it the other way in the Coy case. Under that opinion this would not be error. The writer disagreed with that opinion and dissented.

The judgment will, therefore, be reversed and the cause remanded.

*Reversed and remanded.*